

Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY 10019

Philip Allen Lacovara (PL-5948)
Anthony J. Diana (AD-9914)
Ryan P. Farley (RF-6984)
*Attorneys for Shirin Ebadi and The Strothman Agency, LLC*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SHIRIN EBADI and THE STROTHMAN : 
AGENCY, LLC, :
 :
                    Plaintiffs, :
 :
           -- against -- :
 :
OFFICE OF FOREIGN ASSETS CONTROL :
OF THE DEPARTMENT OF THE TREASURY; :
JOHN W. SNOW, SECRETARY OF THE TREASURY, :
in his official capacity; and ROBERT WERNER, :
DIRECTOR, OFFICE OF FOREIGN :
ASSETS CONTROL, in his official capacity, :
 :
                    Defendants. :
-----------------------------------------------------------------X

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**


Civ. No. _____

## NATURE OF THE CASE

This action is brought by Shirin Ebadi, a celebrated human rights lawyer and the recipient

of the Nobel Peace Prize in 2003, and The Strothman Agency, LLC, a literary agency located in

the United States ("Strothman"). Plaintiffs challenge the regulations and rulings of the United

States Department of the Treasury's Office of Foreign Asset Control ("OFAC") that prohibit Ms.

Ebadi from publishing her memoirs in the United States with the assistance of U.S. persons, such

as Strothman. The regulations and rulings are totally inconsistent with the legislation they are

intended to implement, and further, they violate the constitutional rights of Ms. Ebadi, Strothman

and other U.S. citizens to publish in the United States. They also violate the First Amendment rights of all U.S. citizens to read such publications.

Recent interpretative rulings by OFAC in applying its Iranian Transactions Regulations ("ITR") are restricting the importation of "information and informational materials" in ways that are contrary to the language and intent of the relevant Executive Orders and, more importantly, the legislation that authorizes and prescribes the permissible scope of such embargoes. By preventing Iranian nationals like Ms. Ebadi from communicating with U.S. persons through the medium of published manuscripts in the United States, these same interpretative rulings and regulations are threatening the free exchange of ideas and information that forms the foundation of the First Amendment to the Constitution of the United States of America.

## INTRODUCTION

1.      Plaintiffs bring this action seeking to remove restrictions that the Defendants have imposed on constitutionally and legislatively protected free exchange of ideas and information, through regulations and rulings that prohibit or restrict the publication of works by authors in certain countries subject to United States trade sanctions. Congress has twice declared that U.S. trade embargoes may not be allowed to restrict the free flow of information and ideas that remains vital to a better understanding of the world. Yet the Defendants have promulgated and maintained restrictions on publishing works in the United States from authors in sanctioned countries, in defiance of the Berman Amendment and the Free Trade in Ideas Amendment, which explicitly deprive the Executive Branch of authority to "regulate or prohibit, directly or indirectly," transactions related to information and informational materials, including publications of all kinds.

2.      OFAC has done exactly what Congress has forbidden—making ordinary

publishing activities in the United States illegal if they involve works by authors in countries such as Iran, Cuba and Sudan. Congress has sought to guarantee that information and ideas from people living under sanctioned governments could still be communicated to Americans and that Americans would have access to information and ideas from them. OFAC has flouted Congress's clearly expressed will and has abridged (i) the First Amendment rights of U.S. publishers, editors, literary agents (including, but not limited to, Strothman), authors and translators by denying them the ability to publish and market in the United States works by authors in these restricted countries, (ii) the First Amendment rights of readers in the United States to learn from authors in those restricted countries, and (iii) the First Amendment and statutory rights of authors in countries under embargo to communicate information and ideas to Americans by publishing new, revised or adapted works in the United States.

3.     The Berman Amendment and the Free Trade in Ideas Amendment exempt information and publications from U.S. economic sanctions programs, but OFAC has eviscerated the legislative exemption and declared that Americans like Strothman must apply to OFAC for permission if they want to engage in various categories of activities that publishing requires. Further, this licensing regime established by OFAC has effectively denied Ms. Ebadi the opportunity to publish her memoirs in the United States.

4.     First, OFAC has invented a distinction between works already created and works not yet created. OFAC has ignored the Berman Amendment and the Free Trade in Ideas Amendment for works that have not been completed. Authors in countries under embargo, like Ms. Ebadi in Iran, are effectively prohibited from publishing in the United States because they can neither contract nor collaborate with U.S. publishers, literary agents like Strothman, editors, co-authors or translators to create, revise or adapt their works for publication in the United

States; Americans also cannot pay them advances or royalties.

5.      Second, OFAC has declared that U.S. publishers, editors, co-authors, literary agents like Strothman and translators may not provide substantive or artistic alterations or enhancements to works by authors in embargoed countries, whether the works are new or already exist.   Accordingly, they may not substantively edit works for publication or add materials such as notes, introductions and illustrations to enhance them, which publishers, editors, agents and translators routinely do.   Without such assistance, and especially without assistance from Strothman, Ms. Ebadi is effectively prevented from publishing her memoirs in the United States.

6.      Third, OFAC insists that publishers, editors and literary agents like Strothman may not market or promote works by authors in the restricted countries.   For all practical purposes, that means that authors like Ms. Ebadi, as well as others similarly situated, cannot publish books in the United States.

7.      The United States has historically promoted the open exchange of ideas and information and welcomed the works of authors whose voices may be silenced in their own countries.   Congress intended the Berman Amendment and Free Trade in Ideas Amendment to guarantee the free flow of information and ideas, including information and ideas from countries like Iran, and certainly from authors and human rights activists like Ms. Ebadi, a Nobel Peace Prize recipient.

8.      Congress expressly prohibited the restrictions OFAC has illegitimately imposed on publication in the United States. The restrictions impose an unconstitutional burden on First Amendment rights to publish in the United States.  The restrictions are, further, so vague and contradictory that they are unconstitutional for that reason, among others, as well. Finally, they

17246261.5                                    4

establish a licensing scheme that imposes an unconstitutional prior restraint on speech and press, especially as applied to foreign authors like Ms. Ebadi, that cannot be justified by national security concerns.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to the Constitution of the United States and under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA") and 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 1361, 28 U.S.C. § 2201 and 28 U.S.C. § 1651. This action arises under the laws of the United States, namely the IEEPA; under the APA; and also under the United States Constitution. Venue in this judicial district is proper under 28 U.S.C. § 1391(e).

## PARTIES

10. Plaintiff Shirin Ebadi is a lawyer, a human rights activist and a citizen and resident of the Islamic Republic of Iran. In recognition of her efforts to promote human rights in Iran and throughout the world, Ms. Ebadi was awarded the Nobel Peace Price in 2003.

11. Plaintiff The Strothman Agency, LLC is a U.S. limited liability company incorporated in the State of Delaware with its principal place of business at 1099 Massachusetts Avenue, Lexington, Massachusetts 02420. Strothman provides various services as a literary agent to authors seeking to publish their works in the United States. Wendy J. Strothman is the principal of Strothman.

12. Defendant OFAC is the office within the U.S. Department of the Treasury that is responsible for administering and enforcing United States economic sanctions.

13.     Defendant John W. Snow is the Secretary of the U.S. Department of the Treasury and is named as a defendant in his official capacity.

14.     Defendant Robert Werner is the Director of OFAC and is named as a defendant in his official capacity.

## FACTS

### U.S. Economic Sanctions

15.     U.S. economic sanctions are governed principally by two federal statutes, the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-40, and the IEEPA, 50 U.S.C. §§ 1701-06. TWEA, which was initially enacted as a wartime measure in 1917, was later amended to extend to peacetime national emergencies without a declaration of war. In 1977, Congress enacted IEEPA to provide the Executive Brach with separate and limited authority to impose sanctions in peacetime. U.S. sanctions against North Korea and Cuba, which were originally imposed in 1950 and 1963, respectively, continue under the authority of TWEA, while IEEPA authorizes sanctions imposed in subsequent years against Iran, Sudan and other countries.

16.     OFAC promulgates and enforces U.S. economic sanctions pursuant to TWEA and IEEPA on behalf of the President and Secretary of the Treasury. Separate regulations set out the terms of the embargoes for each country. The regulations for North Korea, Cuba, Sudan and Iran all prohibit most forms of trade to and from the United States. Foreign Assets Control Regulations, 31 C.F.R. § 500 (2004); Cuban Assets Control Regulations, 31 C.F.R. § 515 (2004); Sudanese Sanctions Regulations, 31 C.F.R. § 538 (2004); Iranian Transactions Regulations, 31 C.F.R. § 560 (2004). The regulations challenged here are codified at 31 C.F.R.

§§ 500.206(c), 515.206(a)(2), 538.211(c)(2) and 560.210(c)(2), and the second sentences of §§ 500.550(b) and 515.545(b) (the "OFAC Information Regulations").

17.    The penalties for violations of OFAC's regulations include prison terms of up to ten years and fines totaling up to $250,000 for individuals, and $1,000,000 for corporations. OFAC may, in addition, impose civil penalties of up to $65,000 under TWEA and up to $11,000 under IEEPA through administrative proceedings.    Reporting, Procedures, and Penalties Regulations, 31 C.F.R. § 501.701 (2004); 50 U.S.C. App. § 16 (2004); 50 U.S.C. § 1705 (2004); 18 U.S.C. § 3571 (2004).

### The Berman Amendment

18.    In 1988, in response to several seizures of shipments of magazines and books from embargoed countries at the U.S. border, Congress added an exemption to IEEPA and TWEA to ensure that "informational materials" would not be excluded from the United States. The "Berman Amendment" provided that:

> [t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly, the importation . . . or the exportation . . ., whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials.

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988), 50 U.S.C. App. § 5(b)(4)(1988).

19.    Congress ensured that the exemption for informational materials could not be exploited to interfere with controls on the export of sensitive technology or security information, by excluding materials "otherwise controlled for export under section 5 of the Export Administration Act of 1979," which permits the President to prohibit the export of goods or technology to protect national security, "or with respect to which acts are prohibited by chapter

37 of title 18, United State Code," which enumerates crimes involving espionage and the disclosure of classified information. *Id.*; 50 U.S.C. App. § 2404; 18 U.S.C. §§ 79-799.

20.     The legislative history of the Berman Amendment confirms the importance to Congress of ensuring that trade sanctions not interfere with the international exchange of ideas and information. The conference report declares that the Amendment "clarifies that the Trading with the Enemy Act and the International Emergency Economic Powers Act do not authorize regulations on the export or import of informational material not otherwise controlled under the Export Administration Act." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 1988, *reprinted* in 1988 U.S. Code Cong. & Admin. News 1547, 1872. The relevant House Foreign Affairs Committee's report emphasized that ideas and information should flow freely into the United States and from the United States to the rest of the world, in light of the fundamental First Amendment interests at stake. *See* H.R. Rep. No. 4, 100th Cong., 1st Sess., pt. 3, at 113 (1987).

### OFAC's Response to the Berman Amendment

21.     OFAC amended its regulations purportedly to comply with the Berman Amendment in 1989. The amended regulations expanded the general licensing provisions to authorize all transactions relating to "informational materials" (54 Fed. Reg. 5229, 5231-34 (1989); 31 C.F.R. §§ 500.206, 500.550, 515.206, 515.545 (1990, 2004)), but narrowly defined "informational materials" to include only "information recorded in tangible form," excluding "intangible items, such as telecommunications transmissions." 54 Fed. Reg. 5229, 5231, 5233; 31 C.F.R. §§ 500.332, 515.332 (1990). The exemption for transactions relating to "informational materials" also contained the following unexplained carve-out:

> This section does not authorize transactions related to informational materials not fully created and in existence at the date of the transaction, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services by a person subject to

> the jurisdiction of the United States. Such prohibited transactions include, without limitation, payment of advances for informational materials not yet created and completed, provision of services to market, produce or co-produce, create or assist in the creation of informational materials, and payment of royalties to a designated national with respect to income received for enhancements or alterations made by persons subject to the jurisdiction of the United States to informational materials imported from a designated national.

54 Fed. Reg. 5229, 5231, 5233; 31 C.F.R. §§ 500.206(c) (1990) & 515.206(a)(2) (1990). The new regulations went into effect on February 2, 1989.

22.     Within a year, OFAC's restriction of the scope of "informational materials" exempted from regulation by the Berman Amendment faced two legal challenges. In the first case, the court ruled that artworks qualified as "informational materials" exempt from regulation pursuant to the Berman Amendment. In the second, *Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990), the court accepted OFAC's argument that the exemption did not apply to information not yet physically in being or otherwise in intangible form, such as broadcast communications.

### Congress's Response to OFAC: The Free Trade in Ideas Amendment

23.     Distressed by OFAC's unauthorized narrowing of the Berman Amendment and the outcome in the *Capital Cities* case, Congressman Berman proposed new legislation in 1992, then known as the Free Trade in Ideas Act, to clarify Congress's original intent to allow the import and export of all materials protected by the First Amendment. A summary of the bill reiterated that the legislation was "necessary to clarify the intent of Congress in adopting the Berman amendment," because the Executive Branch had interpreted it "narrowly, to exclude many informational and artistic materials." The new law "makes clear that *all First Amendment protected materials and activities,* including paintings, telecommunications, and travel necessary

for trade in information, are within the ambit of the statute's protection."  138 Cong. Rec.

E1856-04, E1857 (emphasis added).

24.     The Free Trade in Ideas Amendment added the words "information and" to the

phrase "informational materials" in TWEA and IEEPA to make it clear that the exemption

applies to information, even if it has not yet been given tangible form as a "fully created" work at

the time of the transaction.  Congress also added four new examples of informational materials

that would be covered by the exemption and expressly stated that the exemption applies

regardless of format or medium of expression.  The statutory language now reads:

> The authority granted to the President by this section does not
> include the authority to regulate or prohibit, directly or indirectly,
> the importation from any country, or the exportation to any
> country, whether commercial or otherwise, *regardless of format or
> medium of transmission*, of *any information or* informational
> materials, *including but not limited to*, publications, films, posters,
> phonograph records, photographs, microfilms, microfiche, tapes,
> *compact disks, CD ROMs, artworks, and news wire feeds*.

P.L. 103-236, Sec. 525(b), (c) (1994); *codified in* 50 U.S.C. § 1702(b)(3); 50 U.S.C. App.

§ 5(b)(4) (2001).  (The words in italics were added by the Free Trade in Ideas Amendment to the

original text of the Berman Amendment).

25.     The conference committee's report on the Free Trade in Ideas Amendment

specified that the Berman Amendment had been intended, "by including the words 'directly or

indirectly,' to have a broad scope," and to cover all information protected by the First

Amendment.  It explained that the new law was designed to correct the Treasury Department's

"restrictive interpretations, for example limits on the type of information that is protected or on

the medium or methods of transmitting the information." H.R. Conf. Rep. No. 482, 103[rd] Cong.,

2d Sess. (1994), *reprinted* in 1994 U.S.C.C.A.N. 398, 483.  It further clarified that Congress

intended "informational materials" to include both tangible and intangible informational

materials:, "without regard to the type of information, its format, or means of transmission, and electronically transmitted information, *transactions for which must normally be entered into in advance of the information's creation.*" *Id.* (emphasis added).

## The Present OFAC Information Regulations

26.    In spite of this clarification of the statutory language and Congress's explicit articulation of the legislation's purpose, OFAC has continued to misinterpret and misapply the sanctions statutes, in defiance of Congress's manifest intent.

27.    OFAC revised its regulations in response to the Free Trade in Ideas Amendment. The term "information" was added, and the definition of informational materials was revised to encompass "compact disks, CD ROMS, artworks and news wire feeds." 60 Fed. Reg. 8933, 8934 (1995).

28.    However, OFAC made no changes to the provisions of the regulations that forbid Americans from entering into transactions related to information "not fully created and in existence at the date of the transactions"—such as publishing agreements for new or to-be-revised books or articles. *See* 31 C.F.R. §§ 500.206(c), 515.206(a)(2) (2004).

29.    Nor did OFAC retract the prohibitions on "substantive or artistic alteration or enhancement of informational materials" and "the provision of marketing and consulting services" in connection with either existing or not-yet-fully-created works. *Id.*

30.    OFAC's regulations give the agency discretion to authorize otherwise prohibited transactions by way of licenses. *See* Reporting, Procedures and Penalties Regulations, 31 C.F.R. § 501.801 (2004).   They provide for both general licenses, which permit entire classes or categories of transactions, and specific licenses, which require case-by-case determinations and approval by OFAC.

31.    OFAC's license determinations are not subject to any stated criteria. OFAC has stated only that "many" of them are "guided by U.S. foreign policy and national security concerns." OFAC website, Frequently Asked Questions, *available at* http://www.ustreas.gov/offices/enforcement/ofac/faq/#license.

32.    OFAC's regulations permit it to amend or rescind existing licenses at any time or to exclude any person or transaction from the benefit of any general or specific license. *See* 31 C.F.R. §§ 501.803, 500.503, 515.503, 535.503, 538.502 and 560.502 (2004).

33.    There is no limit to how long OFAC may take to respond to a license application. One letter ruling on publishing and the OFAC Information Regulations was issued almost a year and a half after the inquiry was made.

34.    Nor is there any administrative process for appealing the denial of a license. *See* Reporting, Procedures and Penalties Regulations, 31 C.F.R. § 501.801 (2004).

35.    Anyone subject to U.S. jurisdiction who wishes to engage in the transactions or activities barred by the OFAC Information Regulations, which are all inherent parts of the publishing process, must choose between applying for a license from OFAC, which means facing delay and acceding to an unconstitutional prior restraint, and violating the regulations, which means facing civil penalties and criminal sanctions. Authors in sanctioned countries who wish to engage in the transactions or activities barred by the regulations also face an unconstitutional prior restraint on speech in that they cannot commence the publication process in the United States without U.S. persons seeking specific licenses for such publication in advance. On their face, the ITR also do not provide for a process for authors in sanctioned countries to seek a license from OFAC to publish their works in the United States with the assistance of persons and entities in the United States.

## Enforcement of the OFAC Information Regulations

36.    OFAC's enforcement division vigorously investigates violations of its regulations and the statutes it administers.  According to congressional testimony of former OFAC Director R. Richard Newcomb given on June 16, 2004, since 1993, OFAC has imposed penalties in more than 8,000 matters, generating fines of nearly $30 million.

37.    Ms. Ebadi and Strothman do not know how often OFAC has levied sanctions for First Amendment-protected activities because OFAC has only recently begun to make reports of its enforcement actions available to the public.  Plaintiffs are not aware of efforts by OFAC to enforce its overly narrow interpretation of the exemption for "information and informational materials" against publishers of books or journal articles prior to September 2003.

38.    Beginning late last year, however, OFAC issued a series of interpretive rulings that created increasing concern for authors in foreign countries wishing to publish in the United States and U.S. persons, such as Strothman, who seek to assist foreign authors in publishing their works in the United States.

39.    In September 2003, responding to inquiries from U.S. entities interested in publishing books by Iranian authors in the United States and working with Iranian publishers to publish U.S. works there, OFAC ruled that several routine publishing activities would *not* be covered by the exemption and would therefore be barred under the current regulations.  In two letters, OFAC stated:

- U.S. persons may not engage Iranian authors to create new works;

- U.S. persons are not authorized to assist Iranian authors by editing and otherwise preparing their manuscripts for publication, including the reordering of paragraphs or sentences, correction of syntax and grammar, and replacement of inappropriate words, since such activities

"would result in a substantively altered or enhanced product"; and

• U.S. persons may not create illustrations for Iranian-authored works because that would constitute "a prohibited exportation of services."

40.    OFAC also explicitly ruled that the publication of books in the U.S. on behalf of persons in Iran or the publication of books in Iran on behalf of U.S. persons is prohibited.  As OFAC wrote, "Inherent in the publication of a book are marketing, distribution, artistic, advertising and other services not exempt from [OFAC's regulations].  Thus, you may not publish books in the United States on behalf of a person in Iran, nor may a person in Iran publish books on your behalf."

41.    Also in September 2003, OFAC issued an interpretive ruling to the Institute of Electrical and Electronics Engineers ("IEEE"), which publishes scientific and technical journals, that certain ordinary activities undertaken by IEEE in the publication of works by Iranian authors fell outside the "information and informational materials exemption" and therefore were barred. These activities included "the reordering of paragraphs or sentences, correction of syntax, grammar, and replacement of inappropriate words by U.S. persons," because they "may result in a substantively altered or enhanced product, and [are] therefore prohibited under [OFAC's regulations] unless specifically licensed."

42.    OFAC indicated that a U.S. publisher could accept "camera-ready copy" from Iran and distribute it here.  In addition, OFAC stated that the marketing of a periodical with articles by many authors would be permissible, although marketing a particular work by an author in a country under embargo, would not, because "the provision of marketing or business consulting services is generally not permitted as incidental to the importation or exportation of informational materials."

43.     OFAC ruled that IEEE's facilitation of a peer review process, including the selection of reviewers to collaborate with Iranian authors and transmitting the reviewers' comments to the authors, would also violate the regulations because it would substantively enhance the articles.

44.     In October 2003, IEEE submitted supplemental information to OFAC and called upon the agency to recognize that the Berman Amendment exempted all aspects of its publication process from trade sanctions, including editing and peer review.   Congressman Berman sent a letter to OFAC's director stating that its recent interpretations were "patently absurd" and "clearly inconsistent with both the letter and spirit of the law."

45.     On April 2, 2004, OFAC ruled that IEEE could, without a license, engage in the limited peer review process it had described, but only so long as the process begins with completed manuscripts – not new or commissioned material – and provides only "general guidance and suggestions" from reviewers and editors that does not result in the "substantive[]" re-writ[ing] or revis[ing of] the manuscript" or "a collaborative interaction … resulting in co-authorship or the equivalent thereof."

46.     This time, OFAC stated that routine copy editing, such as changing font sizes, correcting linguistic errors and repositioning illustrations, would be exempt because such acts would not amount to substantive alteration or enhancement of the work.

47.     In July 2004, OFAC issued an interpretive ruling stating that it would be permissible for a U.S. person to fund the translation of already-published literary works by Iranian writers, evidently on the theory that reproducing, dubbing or translating existing works would not substantively alter or enhance them, which OFAC reiterated would not be allowed.

48.    On July 19, 2004, in response to a query from the American Society of Newspaper Editors, OFAC issued another contradictory interpretation of the exemption for "information and informational materials." OFAC ruled that a U.S. newspaper could translate a completed article or op-ed commentary by a writer in a sanctioned country into English; edit such a work for space reasons by deleting superfluous text; edit it to correct grammar, syntax or spelling errors; and substantively edit it to make it more cohesive, efficient, argumentative or effective, in the same manner that it would for one of its own writers. OFAC did not explain the departure from its previous rulings or how to square its ruling with the regulations, which bar substantive alteration. OFAC merely stated that "offering substantive edits to the work's content . . . would not constitute substantive or artistic alteration or enhancement of the article or commentary." OFAC did not explain why "substantive edit[ing]" would not constitute "substantive alteration or enhancement" or why newspapers should be treated any differently than books and journals.

49.    Faced with such inconsistency in the interpretation of "substantive . . . alteration or enhancement," Ms. Ebadi, as well as U.S. publishers, editors, literary agents like Strothman, translators and authors are left to wonder which rulings to follow and which transactions remain prohibited by that phrase in the regulations.

50.    There is no uncertainty, however, about other prohibitions in the OFAC Information Regulations. OFAC has consistently maintained that American publishers may not enter into agreements to publish new works or substantially revised works by authors in the targeted nations. Those subject to U.S. jurisdiction may not pay them advances; may not co-author works with them; and may not engage in marketing activities for new or existing works written by them, an activity typically undertaken by publishers and literary agents like

Strothman. Nor may anybody subject to OFAC's rules "substantively or artistically alter or enhance" such works, although OFAC's inconsistent rulings have left the meaning of that phrase dangerously unclear. Given these restrictions on the activities of those subject to U.S. jurisdiction, Ms. Ebadi, a Iranian citizen and resident, has been effectively deprived of her right to publish in the United States.

## The Effects of the OFAC Information Regulations

51.    The OFAC Information Regulations impede the free flow of ideas and information, in every medium, created in whole or in part by individuals in Iran, Cuba and Sudan. Because all of the activities prohibited by the regulations are integral to the publishing process, the regulations effectively make it illegal for Americans to publish any books and, in many cases, journal articles, authored by citizens and residents of sanctioned countries.

52.    Literary agents like Strothman and book publishers have to engage in "transactions relating to information or informational materials not yet fully created," which the regulations prohibit.

53.    For example, literary agents are often retained by authors before a work has been completed and published, and they must therefore engage in "transactions relating to information or informational materials not yet fully created," such as some, if not all, of the following professional services that Ms. Ebadi specifically requires from Strothman:

>    (i) assist in the writing of a proposal for Ms. Ebadi's memoirs to submit to potential publishers, editors, translators, and/or co-authors;

>    (ii) identify publishers, editors, translators, and/or co-authors interested in Ms. Ebadi's proposed memoirs, and submit the proposal and/or manuscript to editors and publishers; in anticipation of contacting publishers and editors, we may also promote Ms. Ebadi and her work to media outlets;

(iii) advise Ms. Ebadi on the value of different offers to enable her to make the most informed decision of editors and publishers with whom to work; we negotiate the terms of agreements with publishers, translators and/or co-authors; we represent Ms. Ebadi's business and legal interests throughout the publishing process, overseeing and reviewing payments from publishers for accuracy and timeliness, examining sales data to ensure that royalties match sales, and providing oversight regarding in-print status of the works;

(iv) edit for substance and style the preliminary manuscript, and subsequent revisions, to communicate effectively Ms. Ebadi's memoirs to an American audience;

(v) provide general advice to publishers on the best ways to promote the author's work and general advice on press relations and publicity for the book, including the negotiation of the terms of any requested interviews or personal appearances to promote the book, as well as monitoring and helping to develop any publicity or advertising for the book; and

(vi) negotiate the terms of the sales of rights subsidiary to any possible book publication, including, but not limited to, magazine or article republication rights, sales of book rights to non-U.S. publishers and/or distributors and sales of audio rights and/or dramatic rights.

54.     For such professional services, literary agents like Strothman typically receive a percentage of any advances, royalties, and other revenues received in connection with the publication of the author's work.

55.     In book publishing and scholarly journals, publishers also have to engage in "transactions relating to information or informational materials not yet fully created"—which the regulations prohibit—to select and shape the works they publish in keeping with their editorial vision and publishing program.

56.     It is standard practice for publishers to enter into publishing agreements with authors, and to negotiate with their literary agents, for new works or works to be revised, before

the works are fully created. Publishers and their editors generally must collaborate with authors and their literary agents before a book or article is completed to help develop the ideas and plan the topics, structure and approach for their works.

57. Authors often must be contractually engaged by publishers before they complete a work. Many authors, including Ms. Ebadi, could not devote the hundreds, if not thousands, of hours required over several years to create a finished work without a prior assurance of publication.

58. Publishers also routinely pay advances on royalties for new works or for works already published abroad. Compensation is a significant inducement for authors, as for all professionals, including literary agents like Strothman, and individuals often cannot afford to spend the time necessary to write and market publications without compensation.

59. The prohibition against the substantive alteration or enhancement of a work also conflicts with the way American publishers of books and journals do their work. Substantive editing and, in many instances, expert peer review, form an integral part of the publication process for almost all authors, a function that is critical to bringing any work into conformity with a publisher's goals and standards, and to ensure that it communicates effectively and will make a worthwhile contribution to knowledge. To be meaningful, the right to publish requires the right to edit. Literary agents also require the ability to edit and to provide substantive comments on manuscripts.

60. OFAC has stated that publishers may "advise the . . . author of the nature and extent of th[e] problems," but publishers, and to a lesser extent literary agents, also regularly "substantively rewrite or revise the manuscript for the authors to remedy those problems," which OFAC has generally forbidden. As discussed below with respect to Ms. Ebadi's contemplated

17246261.5                                                  19

memoirs, barriers of language and culture for many authors from the restricted countries makes such editing all the more important.

61.    Publishers also substantively alter and enhance works by translating them—a process that is far from mechanical—or by adding photographs, artworks, explanatory notes and introductions.    For reference works, photo essays and many other publications, such enhancements are often essential.

62.    OFAC has maintained that any input that rises to the level of co-authorship is forbidden. The prohibition of enhancement therefore also bars authors from working jointly on publications with other specialists in their fields.    In scientific journals, in particular, collaboration and joint authorship are the rule more than the exception. The ban thus prohibits collaborations that could advance knowledge in many fields.    It is especially frustrating for researchers because it forbids Americans to work with co-authors in countries to which Americans do not have free access to conduct research.  It is also quite common in publishing for a prominent person whose accomplishments are outside the world of literature, such as an activist, move star or politician, to work closely with a ghost writer or co-author.

63.    The prohibition against marketing has the effect of rendering it impossible to publish a book authored in whole or in part by an individual in one of the restricted countries, whether it is a new work or an already existing work.  Book publishers cannot feasibly publish books without marketing them.   Literary agents also cannot secure publication of books by authors in sanctioned countries without marketing them in some fashion to publishers in the United States.  Book publishers must, at a very least, describe their upcoming publications in marketing catalogs and employ a sales force to sell their list.  Literary agents likewise must, at the very least, contact publishers and promote works or treatments by the same authors for

potential publication in the United States. Publishers also have to be able to solicit reviews and articles in the press and place advertisements. University and professional publishers also regularly promote their works at academic conferences and promote individual works through electronic databases.

64. According to OFAC, a journal publisher may promote a journal as a whole and thus avoid the marketing prohibition, but a book publisher cannot realistically publish a book without marketing the individual title. Nor can a literary agent secure an agreement for publication for an author without marketing the individual title to potential publishers in the United States. OFAC has recognized as much: "Inherent in the publication of a book are marketing, distribution, artistic, advertising and other services not exempt from the prohibitions . . . ." OFAC thus correctly concluded that, without such services, one cannot publish a book.

65. The OFAC Regulations preclude publication of works of literature, history and social science whose observations can contribute to a better understanding of the people and governments in the restricted nations. They preclude publication of articles in medicine, chemistry and other sciences, as well as eyewitness accounts and analyses of the operations of the regimes U.S. sanctions are intended to oppose. Often, such books and articles cannot be published in the author's native country. Some restricted countries – for example, Sudan – do not have the resources to permit an author to publish books, so that publication in the United States represents one of the only realistic chances for Americans to have access to the author's work. Some, if not all, of the restricted countries also punish dissidents for expressing their views. Because of OFAC's restrictions, a dissident or critic who is not free to publish at home cannot publish here, either.

**Shirin Ebadi**

66.    Ms. Ebadi plans to write a book about her life and career and wants the book to be published in the United States.  The ITR, and the OFAC Information Regulations, as interpreted by OFAC, effectively prohibit the publication of her book in the United States by barring the required assistance from an American literary agent like Strothman, as well as American publishers, editors, translators and authors.  These same regulations and rulings are also silencing the voices of countless other authors in the sanctioned countries.

**Ms. Ebadi's Career**

67.    Ms. Ebadi received her degree from the University of Tehran and became an attorney when it was not common for women to seek higher education and enter professions in Iran.  She practices law and has raised a family in a traditional society in which she struggled to overcome the skepticism and hostility of judges, colleagues and sometimes clients.  She focuses her practice on the law of human rights, including the rights of refugees, children, women and religious minorities such as the Bahai.

68.    Women gradually gained some acceptance in the legal system in Iran, and she ultimately became one of the first female judges in Iran.  She served as President of the City Court of Tehran from 1975 to 1979.

69.    After the revolution in Iran in 1979, she was forced to resign from the bench, but she has continued to work for human rights as a lawyer and to teach law at the University of Tehran.

70.    She has founded the Association for Support of Children's Rights, an organization that actively promotes the protection and rights of children in Iran.  She continues to lead that association today.

71.    Ms. Ebadi is a Muslim. In her legal practice and in her teaching, she strives to promote a modern interpretation of Islam that is in harmony with democracy, equality, religious freedom and freedom of speech. Her beliefs have compelled her to act as an advocate for the disadvantaged and to seek to use the legal system to protect the vulnerable, defend those who speak out and expose those who act to suppress them.

72.    For example, she has represented the families of writers and intellectuals who were murdered in serial fashion in Iran in 1999-2000, and she has worked to expose those who were responsible for fatal attacks on students at Tehran University in 1999. Most recently, she has led the legal team representing the family of Montreal-based photojournalist Zahra Kazemi, who was killed in July 2003 while in detention for taking photographs outside a prison in Tehran during student-led protests. The courts have acquitted the lone intelligence agent indicted in the case and have so far failed to charge the responsible officials. Ms. Ebadi is pursuing various avenues of appeal.

73.    Like many of her cases, the Kazemi case has generated criticism of her advocacy. She has been imprisoned several times for defending human rights and pursuing justice for victims of violence.

74.    Ms. Ebadi's work has been well recognized in the United States. Several newspapers have written about it, including *The New York Times*. With a visa from the State Department, she has visited the United Sates as recently as this past spring. She has received honorary degrees in the United States and has spoken at Harvard and Brown universities, among others, and to the Council on Foreign Relations.

75.    The United States Government has already applauded her "tireless" work for democracy and human rights, *see* Lizette Alvarez, *Iranian Lawyer, Staunch Fighter For Human*

*Rights, Wins Nobel*, N.Y. Times, Oct. 11, 2003, at A1 (quoting White House press secretary

speaking on behalf of President Bush), and has embraced the values that she espouses.  As

President Bush remarked earlier this year:

> When Iran's Shirin Ebadi accepted the . . . Nobel Prize for Peace
> last year, here's what she said: "If the 21st century wishes to free
> itself from the cycle of violence and acts of terror and war and
> avoid repetition of the experience of the 20th century, there is no
> other way except by understanding and putting into practice every
> human right for all mankind, irrespective of race and gender, faith,
> nationality, or social status."  That's a powerful statement coming
> from Iran.  No wonder she won the Nobel Prize.  She's a proud
> Iranian.  She is a devout Muslim.  She believes that democracy is
> consistent with Islamic teachings.  And we share in this belief.
> That's what we believe in America.

40 Weekly Comp. Pres. Doc. 395 (Mar. 15, 2004).

### Ms. Ebadi's Previous Publications

76.    Ms. Ebadi has published many articles and several books about law and human

rights.  These books have been scholarly works intended for an academic or professional

audience.

77.    Some of her books have been translated into English, including *The Rights of the

Child: A Study of Legal Aspects of Children's Rights in Iran* and *History and Documentation of

Human Rights in Iran*.  They are academic and legal works that were written for Ms. Ebadi's

professional peers, and were not written specifically for the American public.

### Ms. Ebadi's New Book Project

78.    Ms. Ebadi would now like to write a book for an American and international

audience, to tell the story of her life and career and her personal and professional growth as a

woman, a mother and a lawyer both living and working in a country that confronts many human

rights problems.  The book would hopefully give American readers a greater understanding of

Iranian society and of the determination of one woman to seek justice in a society that has never

expected women to achieve much influence in public affairs. Ms. Ebadi's receipt of the 2003 Nobel Peace Prize makes it likely that there would be a substantial audience in the United States interested in reading about her experiences.

79.     The new book would explain how Ms. Ebadi came to pursue her education and her career and how she became a lawyer, a judge and a law professor despite the obvious and often official obstacles women in Iran have had to face. It would recount the late nights she spent secretly writing articles and books, after working all day and taking care of her family at home. It would describe the challenges professional women faced both before and after the revolution in 1979. It would discuss her feelings, as a mother of daughters, about the lives they can make for themselves in modern Iran.

80.     The book would also describe her work on behalf of women, children, refugees and victims of political and religious persecution—her advocacy as a lawyer, her teachings and writings, her decisions as a judge, and her continuing pursuit of justice for those who have suffered for expressing their views.

81.     Ms. Ebadi would not write such a book for publication in Iran right now. She wants her book to express her own ideas and not the ideas that receive official approval. She also wants to be able to continue her work as an attorney and activist for human rights in Iran, which might be threatened should such a book get published in the Iran.

82.     Ms. Ebadi very much wants this new book to reach an audience in the United States. She believes open communication is essential to building understanding between the American and Iranian people. Many Americans have expressed interest in learning about her personal story and learning more about human rights struggles in Iran.

## The Practical Barriers to Ms. Ebadi Publishing in the United States

83.     Ms. Ebadi will require a significant amount of assistance to publish her memoirs in the United States, which would certainly include assistance in drafting a suitable work for an American audience.  As an initial matter, there is a significant language and cultural barrier that must be overcome to communicate effectively Ms. Ebadi's life story to an American reader.  Ms. Ebadi speaks and reads very limited English, and, therefore, she would not be able write her memoirs in English.  A word-for-word English translation of Ms. Ebadi's memoirs written in her native tongue, Farsi, would not be appropriate for an English-speaking, American audience because of the structure of the Farsi language.

84.     Additionally, Ms. Ebadi is not familiar with the style of writing suitable for an American audience, which is much different from the style of writing of Iranian authors.

85.     Ms. Ebadi also requires advice concerning the amount of detail that she must provide to American readers about the history and culture of Iran and the history and principles of Islam.  The social and historical context of many events of Ms. Ebadi's life (and even passing references to Iranian events, people, places and customs) would have to be explained at some length to American readers.  Further, the history and principles of Islam are not as familiar to many American readers as they are to Iranians, but they are central to Ms. Ebadi's life and work and must be understood, and thus explained, to communicate effectively Ms. Ebadi's intended message.  Accordingly, Ms. Ebadi's writing may have to be reconstructed, with substantive editing and artistic enhancements from her literary agent, editors and possibly a co-author in the United States, both to answer questions Americans would expect to be addressed, and to sound comfortable to American ears.

86.     Another barrier to the publication of Ms. Ebadi's memoirs in the United States is Ms. Ebadi's limited knowledge of the publishing process in the United States, including, for example, the necessary initial steps in getting a book published for wide distribution, the standard terms of publishing agreements, and the reputations of potential publishers, editors, translators and co-authors. Ms. Ebadi also has limited knowledge of the marketing aspects of book publishing in the United States.

### The Assistance Required by Ms. Ebadi to Publish her Memoirs in the United States

87.     Ms. Ebadi has an outline and notes of a manuscript of her memoirs which she would like to develop into a book suitable for publication in the United States. To make sure that Ms. Ebadi's memoirs are properly presented to the American public, and that they are published and promoted in a way that is consistent with Ms. Ebadi's goals and her vision, Ms. Ebadi requires the assistance of an experienced literary agent like Strothman.

88.     Therefore, to ensure that Ms. Ebadi's work will truly communicate her thoughts and experiences to American readers, she must work closely with her literary agent, publishers, editors and translators in the United States, and perhaps another writer. They would work with her to develop the themes and structure of the book as well as the language in which her ideas are expressed. A literary agent would also help assure that Ms. Ebadi can make arrangements with an appropriate publisher to publish and market her contemplated book.

89.     Ms. Ebadi expects her collaboration with a literary agent and with the editors (and possibly a co-author) to be extensive, and it would undoubtedly result in substantive alterations and enhancements of the preliminary draft manuscript that she has prepared.

90.     To make sure that her proposed book is properly presented to the public, and that it is published and promoted in a way that is in keeping with Ms. Ebadi's goals and consistent

with her vision, she will need to work with a literary agent like Strothman that would, among other things: (i) help her write and shape a proposal to submit to publishers; (ii) identify publishers and editors interested in her work; (iii) help in the editing process of the preliminary manuscript that she has drafted to communicate more effectively her story to an American audience; (iv) negotiate the terms of a publishing agreement; and (v) help promote her work in the United States.

91.     Because Ms. Ebadi is not familiar with the U.S. publishing business, she is not in a position to find and negotiate a contract with a publisher, or to market and promote the work, without the help of a literary agent.  Finding an appropriate publisher, the negotiation of a publishing contract that adequately protects her interests and vision, and the marketing and promotion of her work, are all necessary and important parts of the process of publication in the United States.

92.     Ms. Ebadi anticipates participating in the promotion and marketing of her work by, among other things, granting interviews to journalists and making personal appearances to promote the book.

## The ITR and the OFAC Information Regulations Prohibit Ms. Ebadi from Publishing in the United States

93.     Ms. Ebadi has received initial inquiries of interest from U.S. publishers, but the ITR and the OFAC Information Regulations stand squarely in the way of her proceeding with publishing in the United States.

94.     Interest in books about Iran in the United States is high, as evidenced by the many American readers of the memoir "*Reading Lolita in Tehran*." Because the author of that book lives in the United States, she was free to tell her story; however, because of the ITR and the OFAC Information Regulations in particular, the stories of people still living in Iran cannot be

told.

95.     Because Ms. Ebadi is a citizen and resident of Iran, the publication of her book by an American publisher, and even her representation by an American literary agent like Strothman, would be barred by OFAC's interpretation of the ITR, for the following reasons: (i) the literary agent would provide substantive artistic advice at the earliest stages of Ms. Ebadi creating the proposal and manuscript; (ii) the literary agent would provide business and marketing advice as they approach publishers together; (iii) Ms. Ebadi likely would be paid an advance and royalties for a work that has not yet been completed; (iv) throughout the process of writing, editing and publication, the publisher, the literary agent and possibly another writer would provide additional artistic alterations and enhancements; (v) and the publisher and literary agent would actively market the book and give Ms. Ebadi business advice regarding the book's publication and promotion.

96.     Although Ms. Ebadi has located the literary agent with whom she would like to work—Strothman—she has been unable to retain Strothman because of the ITR, and she has had to agree to condition the retention upon the resolution of these legal issues. Similarly, although Ms. Ebadi has been approached by several American publishers who have expressed interest in her book, any offers for the book have been made subject to the condition that payment of the advance and publication of the book will not proceed without satisfactory resolution of the legal issues raised in this action.

97.     For the book to be published, Ms. Ebadi will have to enter into a formal and final agreement with the literary agency which she has chosen. Working with her, Ms. Ebadi will have to reach an agreement with a publisher that includes the standard provisions for payment of an advance and royalties. Writing is a source of financial support for Ms. Ebadi and her family

and for her work on human rights.  Unfortunately, she could not afford to spend the time it would take to write the book without being assured that it will be published and that she will be compensated for the time she would have to take away from her other pursuits.

## Irreparable Injury

98.     The continued threat posed by the OFAC Information Regulations and OFAC's recent interpretive rulings causes irreparable harm to publishers, editors, literary agents like Strothman, authors and translators, whose work is inhibited, and to the public, whose access to information is impaired.  They also cause irreparable harm to authors in sanctioned countries like Ms. Ebadi because they prevent work from such authors from being published in the United States.  But for those regulations and rulings, works would be created, improved and published that would contribute to ongoing research in many and fields inform the public on matters of current and historical importance.

99.     Citizens and government officials make public policy decision every day.  Both scientific and social progress depend upon the timely publication of research being performed worldwide and the dissemination of information and ideas from foreign countries.  The clock cannot be turned back to recover the opportunities that are being lost to build on the unconstrained circulation of information and ideas.

100.    OFAC's current interpretation of the OFAC Information Regulations and the ITR are preventing Ms. Ebadi from writing her memoirs as she has no assurance that they ultimately will be able to be published in the United States with the assistance of U.S. persons.  Her speech is being silenced by the OFAC's interpretation of the OFAC Information Regulations and the ITR, which constitutes irreparable harm.  By preventing Ms. Ebadi from communicating her thoughts and ideas to American readers, an opportunity for Ms. Ebadi to express her ideas and

thoughts to Americans may also be lost forever and Americans may be denied an opportunity to hear from an important person.

101.   The facts establish the likelihood of Plaintiffs' success on the merits of the claims herein.

102.   No previous application for preliminary relief has been made in this action.

### FIRST CAUSE OF ACTION
### THE OFAC INFORMATION REGULATIONS VIOLATE TWEA AND IEEPA AS AMENDED BY THE BERMAN AND FREE TRADE IN IDEAS AMENDMENTS

103.   Plaintiffs repeat, replead, and reallege each of the allegations contained in paragraphs 1 through 102 of the above, as if fully set forth herein.

104.   TWEA and IEEPA, as amended by the Berman and Free Trade in Ideas Amendments, prohibit OFAC from regulating or prohibiting the import and export of any and all First Amendment protected materials, directly or indirectly.

105.   The OFAC Information Regulations openly defy that unconditional ban by regulating and prohibiting, directly and indirectly, the import and export of information and informational materials, violating not only the plain language of the statutes, but the clearly expressed intent of Congress as evidenced in the statutes' legislative history.

106.   Sections 500.206(c), 515.206(a)(2), 538.211(c)(2), and 560.210(c)(2) of Title 31 of the Code of Federal Regulations, and OFAC's recent interpretive rulings, violate TWEA and IEEPA, as they have been amended by the Berman Amendment and the Free Trade in Ideas Amendment., exceed OFAC's statutory authority and are arbitrary and capricious.

## SECOND CAUSE OF ACTION
## THE OFAC INFORMATION REGULATIONS ARE UNCONSTITUTIONAL

107.    Plaintiffs repeat, replead, and reallege each of the allegations contained in paragraphs 1 through 102 of the above, as if fully set forth herein.

108.    The OFAC Information Regulations are unconstitutional on their face and as applied, under the First and Fifth Amendment to the United States Constitution.

109.    The prohibitions impose an unconstitutional burden on core First Amendment rights, including the rights to speak and publish in the United States, the rights of United States citizens like Strothman to promote and assist the publication of constitutionally protected materials in the United States and the American public's right to receive information.

110.    The OFAC Information Regulations are unconstitutionally vague because they fail to provide the kind of notice that would enable ordinary people to understand what conduct is prohibited and they authorize arbitrary and discriminatory enforcement, in violation of the First and Fifth amendments to the Constitution, infirmities that are highlighted by OFAC's contradictory interpretive rulings.

111.    The OFAC Information Regulations are also unconstitutional on their face or as applied in that they are overbroad and encompass within their coverage activities that are clearly protected by the guarantees of the First Amendment to the Constitution of the United States.

112.    The OFAC Information Regulations are also unconstitutional on their face or as applied in that they are susceptible to sweeping and improper application to protected activities in violation of the First Amendment to the Constitution of the United States.

113.    The application of the licensing scheme contained in the OFAC regulations, 31 C.F.R. § 501.801, to information and informational materials, also imposes an impermissible prior restraint on First Amendment protected speech.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.      Set the case down for hearing on Plaintiffs' motion for a preliminary injunction.

2.      After hearing, declare that sections 500.206(c), 515.206(a)(2), 538.211(c)(2), and 560.210(c)(2), as well as the second sentences of §§ 500.550(b) and 515.545(b) of the OFAC Information Regulations in Title 31 of the Code of Federal Regulations, violate TWEA and IEEPA.

3.      Declare that sections 500.206(c), 515.206(a)(2), 538.211(c)(2), and 560.210(c)(2), as well as the second sentences of §§ 500.550(b) and 515.545(b) of the OFAC Information Regulations in Title 31 of the Code of Federal Regulations of the Regulations, abridge the freedoms secured by the First Amendment to the Constitution.

4.      Declare that sections 500.206(c), 515.206(a)(2), 538.211(c)(2), and 560.210(c)(2), as well as the second sentences of §§ 500.550(b) and 515.545(b) of the OFAC Information Regulations in Title 31 of the Code of Federal Regulations of the Regulations, violate the First and Fifth Amendments of the Constitution because they are unconstitutionally vague or otherwise constitutionally infirm.

5.      Declare that 31 C.F.R. § 501.801, to the extent that it applies to information and informational materials exempted from regulation by the Berman Amendment and the Free Trade in Ideas Amendment, imposes an unconstitutional prior restraint on speech and press.

6.      Preliminarily and permanently enjoin OFAC from enforcing sections 500.206(c), 515.206(a)(2), 538.211(c)(2), and 560.210(c)(2), and the second sentences of §§ 500.550(b) and 515.545(b) of the OFAC Information Regulations in Title 31 of the Code of Federal Regulation and any other sections that regulate information or informational materials exempted from regulation by the Berman Amendment and the Free Trade in Ideas Amendment.

7.    Grant Plaintiffs their attorneys' fees and related costs in this action.

8.    Grant such additional relief as the Court deems just and proper.

Dated:   New York, New York
         October 22, 2004

Respectfully submitted,

MAYER, BROWN, ROWE & MAW LLP

Philip Allen Lacovara (PL-5948)
Anthony J. Diana (AD-9914)
Ryan P. Farley (RF-6984)
1675 Broadway
New York, New York  10019
Tel: 212-506-2500

*Attorneys for Shirin Ebadi and The Strothman
Agency, LLC*

17246261.5                                    34